## In re JAMES CAROTHERS & CO.

(District Court, W. D. Pennsylvania. November 3, 1910.)

No. 4,132.

1. BROKERS (§ 6*)—STOCKBROKER AND CUSTOMER—RELATION.
Relation of stockbroker and customer is that of principal and agent and not that of debtor and creditor.

[Ed. Note.—For other cases, see Brokers, Cent. Dig. § 4; Dec. Dig. § 6.*]

2. BANKRUPTCY (§ 140*)—STOCKBROKER—SECURITY—PROCEEDS—DISTRIBUTION.
Where stockbrokers, at the time they were adjudicated bankrupts, had securities in the hands of their New York correspondents belonging to customers, the referee properly undertook the distribution of the proceeds of such securities among the claimants who previously owned them as against the general creditors of the bankrupt.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 140.*]

3. BANKRUPTCY (§ 336*)—CLAIMS—AMENDMENT.
While the owners of specific securities in the possession of the bankrupts or their New York correspondents, when bankruptcy intervened, in ignorance of their legal rights to follow their securities or the proceeds thereof, filed general claims against the estate, the referee properly permitted their amendment so as to cover the proceeds of such securities.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 336.*]

4. BANKRUPTCY (§ 140*)—STOCKBROKERS—BONDS—DISTRIBUTION.
Where stockbrokers, at the time of bankruptcy, had securities in the hands of their New York correspondents, a large part of which belonged

to their customers, and such securities were sold by the trustee, all of the creditors, who could identify any of the securities included in such New York account as their own, were entitled to share in the proceeds of the sale thereof so long as there was a balance to their credit on the books of the bankrupt which would not be wiped out by allowing them to share such proceeds.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 140.*] ·

5. BANKRUPTCY (§ 140*)—STOCKBROKERS—PROCEEDS OF SECURITIES DEPOSITED AS MARGIN.

When certain stockbrokers became bankrupt, they had in the possession of their New York correspondents certain securities owned by them individually, deposited by them as margins; these securities taking the place of cash collateral deposited by various owners of stock in the account of the New York correspondents. Held, that the bankrupts' general creditors were not entitled to the benefit of the proceeds of such securities, but that such proceeds should be applied first to the relief of all those customers who were entitled to share in the balance shown by such New York account.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 140.*]

6. BANKRUPTCY (§ 140*)—STOCKBROKERS—MARGINS—DIVIDENDS—INTEREST.

Dividends on stock in such New York account, the owners of which were unidentified, and interest on a bank balance, would also be presumed entered as margins for securities in the New York account and distributable to the owners of the shares contained therein.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 140.*]

7. BANKRUPTCY (§ 267*) — STOCKBROKERS — SALE OF SECURITIES — RIGHTS OF GENERAL CREDITOR.

Where stockbrokers in bankruptcy had certain securities in possession of their New York correspondents belonging to customers who were indebted to the bankrupts in excess of the value of securities bought for them, and the account against such customers was uncollectible, the loss sustained by such bad account being one that would fall on the general creditors, and not on those holding other securities in the hands of such New York correspondents, the general creditors should have a pro rata share in the New York account in proportion to such bad accounts.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 267.*]

8. BANKRUPTCY (§ 267*)—STOCKBROKERS—SPECIFICALLY PLEDGED SECURITIES.

Where stockbrokers in bankruptcy had in their hands certain securities pledged to their New York correspondents belonging to customers whose claims against the bankrupts' estate were adjusted without assertion of title to their securities, the bankrupts' general creditors were entitled to such benefit out of their securities held by the bankrupts' New York correspondents as the owners of the securities might otherwise have had.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 267.*]

9. BANKRUPTCY (§ 267*)— STOCKBROKERS — SECURITIES SPECIFICALLY PLEDGED —LOST CLAIMS.

Where stockbrokers in bankruptcy had in the possession of their New York correspondents securities belonging to customers whose rights were either surrendered or lost subsequent to the filing of the petition in bankruptcy, the proceeds of such securities were applicable to the claims of general creditors and not to the owners of other specific securities contained in such New York account.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 267.*] ·

10. BANKRUPTCY (§ 484*)—RECEIVER—FEES—ALLOWANCE.

Where a receiver in bankruptcy was afterwards appointed trustee, and the receiver's counsel also acted as counsel for the trustee, the settlement

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

of the receiver's fees and those of his counsel shall be determined in connection with the claim for commissions and fees for services rendered to the estate as a whole.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 484.*]

In the matter of bankruptcy proceedings of James Carothers & Co. On exceptions and petitions for review of referee's order concerning the disposition of certain assets of the estate. Modified and affirmed.

Chantler & McClung, for trustee and receiver.
Lyon & Hunter, Seymour, Patterson & Siebeneck, and Blakeley & Calvert, for excepting creditors.

ORR, District Judge. Upon exceptions and petitions for review the referee has certified to this court questions arising upon the distribution of a special fund in the hands of the trustee.

On May 18, 1908, at the time of filing the involuntary petition, a receiver was appointed for the bankrupts' estate. The liabilities of the bankrupts at that time were in the neighborhood of $2,169,000, of which $327,254.14, was unsecured. The bankrupts were stockbrokers doing business in Pittsburgh in this district. They had but one correspondent in the city of New York, named E. B. Smith & Co., in whose possession were certain securities, all of which, so far as said correspondent was concerned, were the property of the bankrupts. The method of transacting the business between the two firms was as follows:

"Orders for the sale or purchase of securities by customers of Carothers & Co. were given to the firm in Pittsburgh, either verbally or in writing. These orders were transmitted by wire from Carothers & Co. to Smith & Co., and Smith & Co. then purchased or sold the securities ordered on the floor of the New York Stock Exchange. Smith & Co. received from and delivered to the members of that exchange from whom they purchased or to whom they sold securities memorandum slips showing the name of the purchaser or the seller and the number of shares of stock bought or sold. They then advised Carothers & Co. by wire of the purchase or sale of the securities in accordance with the orders given in the same manner, and afterwards confirmed this wire by letter, which showed the firms from whom or to whom Smith & Co. had bought or sold securities, together with the number of shares bought or sold. Carothers & Co. then entered in their books in the appropriate account the number of shares of each security bought or sold for their customer, and rendered to such customer a memorandum showing the transaction."

It will be observed that the securities, although appearing to E. B. Smith & Co. to be the property of the bankrupts, were in large part the property of the bankrupts' customers.

Upon his appointment the receiver closed out the said New York account and realized therefrom a net balance of $18,688.33. He filed a separate account of such transaction, and, it appearing to the court that he had been selected as trustee, the balance in his hands as receiver was awarded to him as trustee to be accounted for by him in the latter capacity in due course, and to be subject to examination and exception by all the parties in interest.

A customer of the bankrupts, who claimed to be the owner of

securities held by the New York correspondent, presented his petition to the referee for a distribution of the proceeds of the New York account, in which petition others joined likewise claiming ownership of shares in said account. To the petition of said claimants the trustee made answer fully and at length, and the matters were heard and disposed of by the referee upon petition and answer. No evidence was introduced except the proofs of claims of the parties claiming the proceeds.

It is unnecessary to dwell upon the relations between the claimants to the stock in the hands of the New York correspondent and the bankrupts. The relation of stockbroker and customer is not that of debtor and creditor, but that of principal and agent. See Richardson v. Shaw, 209 U. S. 365, 28 Sup. Ct. 512, 52 L. Ed. 835, and Thomas v. Taggart, 209 U. S. 385, 28 Sup. Ct. 519, 52 L. Ed. 845. It was therefore proper for the referee to undertake a distribution of the special fund derived from the sale of the securities in the hands of the New York correspondent and distribute it to such parties as may be entitled thereto as against the general creditors of the bankrupts.

There are three questions before us:

First. Whether certain creditors were entitled to amend their proofs so as to claim the proceeds specifically of securities embraced in said New York account. It is clear that the referee was right in his ruling with respect to such amendments, both upon reason and authority. Nothing need be added to what he has stated in his opinion in that regard, which is as follows:

"The first question raised by the objecting creditors was that, certain of the creditors having filed their proofs of claim as simply unsecured claims without any reservation therein of the right to claim specific stocks of proceeds, under the authority of In re Jacob Berry, 23 Am. Bankr. Rep. 27 [174 Fed. 409, 98 C. C. A. 360], they must be taken to have elected to waive their right to claim such specific stocks or their proceeds, and therefore were not entitled to share in the distribution as proposed. This objection, in the opinion of the referee, should be overruled. In the case In re Jacob Berry, the circumstances were different from the case at bar, and showed a deliberate election. In the opinion in that case the court says: 'If the record showed that the petitioner (who had filed a proof of claim for an unsecured debt) made his claim without knowledge of the facts, or even in ignorance of his legal rights to follow his certificate or the proceeds, the situation might be different, but it does not.' In this case there is no evidence whatever that the claimants did anything more than simply file their proofs of claim, and they now ask leave to amend. In the opinion of the referee this amendment should be allowed under the authority of Hutchison v. Otis, 190 U. S. 552 [23 Sup. Ct. 778, 47 L. Ed. 1179], and the claimants be permitted to assert their right to follow the certificates of stock claimed by them or their proceeds, if otherwise they possess such right."

Second. The referee divided the creditors into three classes.

"Class A" he styled the creditors who owned securities embraced in the New York account only and owned no other securities which were or should have been in possession of the bankrupts at the date when the petition was filed.

"Class B" he styled those who owned securities embraced in the New York account and also owned other securities, which were or should have been in the hands of the bankrupts at that date.

"Class C" he styled those owners of securities embraced in the New York account who made no claim to any of the proceeds, including also the bankrupts individually and others who were unidentifiable.

To class A only the referee awarded a proportion of the proceeds, being such proportion as the selling price of the securities belonging to the several creditors in that class bore to the aggregate selling price of all the securities in the New York account. The balance of the fund he awarded to the trustee for the benefit of the general creditors.

The court cannot escape the conclusion that the referee in not making some distribution to class B was in error. Having due regard to the large business done by the bankrupts, as shown by their great liabilities, and to the relative unimportance of the New York account, it would seem that all of those creditors who could identify any of the shares included in the New York account as theirs would be entitled to share in the proceeds of the sale of their stock so long as there was a balance to their credit upon the books of the bankrupts which would not be wiped out by allowing them the New York stock or its net proceeds. Every one of the creditors of class B had a balance to his or her credit upon the books of the bankrupts, which would not be wiped out by the application thereto of his or her New York holdings. The referee seems to have disallowed their claims because he could not presently ascertain exactly their several pecuniary interests in the assets of the bankrupts generally. But, under the authority of the two cases first cited above, the customer is entitled to any shares purchased for his account and owned by him, so long as he thereby does not become debtor to the broker or his bankrupt estate.

There were among the assets in the New York account certain securities which appear to have been owned by the bankrupts individually. The referee was of the opinion that, because the rights of all creditors were fixed as of the date of the filing of the petition, the bankrupts' securities in the New York account belonged to the general creditors and could not be applied in relief of customers whose shares were held by the New York correspondent. But the fact appears that such securities "were part of the margins deposited by Carothers & Co. as security for Smith & Co. on Carothers' account. These stocks and bonds as between the two firms took the place of cash collateral deposited by various owners of stocks in the New York account." The moneys paid in by the customers to the bankrupts as margins upon their purchases in New York are presumed to be available to the general creditors of the bankrupts in lieu of the securities identified as the property of the bankrupts. If those securities had not been delivered to the New York correspondent, the money of the customers purchasing shares through the medium of the New York correspondent should have been placed with the latter. It is not equitable that the general creditors should have the benefit of the money paid in as margins and as well also the benefit of the shares or the securities owned by the bankrupts individually and substituted for such moneys with the New York correspondent. The court is therefore of the opinion that the shares identified as the property of the bankrupts individually, or rather the proceeds thereof, should be applied first in

relief of all others who are entitled to share in the balance shown by the New York account.

There appear in the New York account three dividends on three separate blocks of stock, the owners of which are unidentifiable. Because they are unidentifiable, and being dividends only, the presumption is that they were the property of the bankrupts. They do not aggregate even $200, and it is reasonable to conclude that they were intended as margins for securities in the New York account.

The same is true of a small item of interest on bank balance. Being margins, such dividends and interest, as well as the securities of the bankrupts individually, should be applied in relief of all the owners of shares in the New York account.

With respect to certain of the securities held by the New York correspondent and identified as the property of Helligan and of Moore, who were at the date of the petition in bankruptcy debtors to the bankrupts in excess of the value of the securities bought for them and the items in regard to which were marked by the receiver "bad acct.," it appears inequitable that the proceeds of the sale of such securities should go to the benefit of other owners of stocks in the New York account. The loss arising from the transactions with those customers would fall upon the general creditors, and the latter should have the benefit of a pro rata share in the New York account, so far as the bad accounts appear, and there should be a pro rata distribution to the trustee for the benefit of the general creditors of the proceeds realized from the sale of the Helligan and Moore securities.

Two customers, Mitchell and C. F. Patterson, who were the owners of certain securities in the hands of the New York correspondent, have made no claim to any share of the proceeds for the reason that their claims against the bankrupt estate were adjusted without assertion of title to the specific securities embraced in the New York account. They have been made whole, so far as appears in the consideration of the matter before us, at the expense of general creditors. Therefore general creditors are entitled to such benefit out of their securities held by the New York correspondent as the owners might otherwise have had.

So with respect to the stock of Smith Agnew, who was embraced in class B. His proof of claim against the bankrupt estate was not filed within a year of the order of adjudication, and therefore, under section 57 of the bankrupt act (Act July 1, 1898, c. 541, 30 Stat. 560 [U. S. Comp. St. 1901, p. 3443]), his claim was not allowed by the referee. In this action of the referee he appears to have acquiesced. Mitchell, Patterson, and Agnew could each have claimed a share in the New York account at the date of the petition in bankruptcy. Their rights were surrendered or lost subsequent to that date. It is clearly inequitable that other owners of shares held by the New York correspondent should have the benefit of their waiver or neglect.

Upon this second question, therefore, this court rules that in making distribution of the specific fund in the hands of the trustee the securities specifically identified as the property of Carothers & Co., together with the unidentified dividends and the interest, should be

first applied in relief of all those interested in the securities in the New York account. Then that the members of class A and of class B (excluding therefrom Smith Agnew) and the general creditors represented by the trustee should share pro rata in the fund for distribution, having due regard to the respective values of the several securities to which they are entitled as herein indicated.

Third. The referee appears to have overlooked the claim of the receiver for his commissions and the fees of his counsel. His distribution includes an allowance to the trustee and also to the trustee's counsel. The trustee and the trustee's counsel are the same as the receiver and the receiver's counsel. It may be that the referee considered such allowances at present to be improper. The balance shown by the receiver's account, after deducting the amount claimed by him, is $17,513.33, which sum is recognized as the correct balance by all of the creditors embraced with class A and class B, as appears by their petition for distribution. They are not now in a position to question, and do not question, the propriety of the charges for fees in the receiver's account. General creditors, however, still have a right to question the propriety of those charges. So far as they are concerned, that question can best be considered upon the audit of the final account of the trustee. Inasmuch as payments out of the special fund will now be made only to class A and class B, who are satisfied that the amount for distribution is the amount last mentioned, distribution shall now be made only of that sum. After payment of the pro rata share due the members of class A and class B, the balance must be held by the trustee until final distribution, at which time the propriety of the commissions of the receiver and the fees of his counsel, for services rendered in the special matter, must be determined in connection with his claim for commissions and fees for services rendered to the estate as a whole. This is a proper course in view of the fact that no evidence was offered before the referee as to the propriety of the charges.

Except as modified by this opinion, the decision of the referee should be sustained and the matter referred again to him to make distribution in accordance with the views herein expressed.